914 F.2d 447
 16 U.S.P.Q.2d 1121
 David A. BRITTINGHAM; Thrasher's, Incorporated; Thrasher's
of Georgetown, Incorporated, Plaintiffs-Appellants,
v.
Charles R. JENKINS; Synepuxent Pier and Improvement
Company; Time, Incorporated; Ocean Fries
Corporation, Defendants-Appellees,
and
Resort Leisure Industries, Incorporated, Defendant.
David A. BRITTINGHAM; Thrasher's, Incorporated; Thrasher's
of Georgetown, Incorporated, Plaintiffs-Appellants,
v.
Charles R. JENKINS; Synepuxent Pier and Improvement
Company; Time, Incorporated; Ocean Fries
Corporation, Defendants-Appellees,
and
Resort Leisure Industries, Incorporated, Defendant.
 Nos. 89-1560, 89-1579.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 16, 1990.
Decided Sept. 11, 1990.
Rehearing and Rehearing In Banc
Denied Oct. 16, 1990.
 
 Larry Steven Gibson, Shapiro and Olander, Baltimore, Md. (Larry Steven Gibson on brief), for plaintiffs-appellants.
 Raymond Stevens Smethurst, Jr., Adkins, Potts & Smethurst, Salisbury, Md., (Barbara R. Trader, Adkins, Potts & Smethurst on brief), Robert R. Priddy, Elliott I. Pollock, Pollock, Vande Sande & Priddy, Washington, D.C., for defendants-appellees.
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 ERVIN, Chief Judge:
 
 
 1
 David A. Brittingham,[1] the holder of both federal and Maryland state registrations for the service mark THRASHER'S, brought this infringement action against Charles R. Jenkins[2] under the Lanham Trademark Act, 15 U.S.C. Secs. 1051 et seq. Jenkins filed an answer and a counterclaim alleging, inter alia, that Brittingham had obtained his trademark registrations fraudulently, that Jenkins owned the common law service mark THRASHER'S, and that Brittingham had infringed upon Jenkins's mark. In the court below, Brittingham and Jenkins each argued that they were entitled to monetary damages and injunctive relief. Following a bench trial, the district court found that Brittingham had obtained his trademark registrations in a fraudulent manner, that Brittingham had infringed upon Jenkins's common law mark, and that Jenkins was entitled to recover on his counterclaim despite Brittingham's asserted defense of laches. Accordingly, the court ordered the cancellation of Brittingham's federal and Maryland state trademark registrations, permanently enjoined Brittingham from using the THRASHER'S service mark, and awarded Jenkins damages, interest and attorneys' fees. This appeal followed. For the reasons set forth below, we affirm the district court's cancellation of Brittingham's registrations, but on grounds other than fraud in the initial application for registration. In addition, we reverse that part of the district court's decision relating to laches, and remand this case for a recalculation of damages and attorneys' fees.
 
 I.
 
 2
 In 1940, Joseph T. Thrasher began selling french fried potatoes during the summer months at a food stand in Ocean City, Maryland, under the name THRASHER'S. Around 1961, Thrasher sold the business, including the common law rights to the THRASHER'S service mark, to Franklin Hastings. Hastings operated the business until his death in 1973. At that time, ownership of the business and the THRASHER'S mark passed by inheritance to Hastings' wife, Irma.
 
 
 3
 On March 13, 1974, Mrs. Hastings agreed to sell her interests in several enterprises to Jenkins.[3] The contract between Mrs. Hastings and Jenkins was silent with regard to the french fry business and the THRASHER'S mark. At trial, however, Mrs. Hastings testified that, pursuant to an oral agreement between Jenkins and herself, she had sold all of her rights to the french fry business and the THRASHER'S mark to Jenkins along with her other business interests. The trial court believed Mrs. Hastings' testimony, and explicitly found that all common law rights to the THRASHER'S mark had been transferred from Mrs. Hastings to Jenkins in 1974.
 
 
 4
 In 1968, Brittingham began working for Mr. Hastings, his uncle, as a bookkeeper. Eventually, Brittingham started to manage the french fry stand as well. After his uncle's death, Brittingham continued to work at THRASHER'S, either as an employee or a partner of Mrs. Hastings, who operated THRASHER'S until the end of the 1974 summer season.
 
 
 5
 Thereafter, Brittingham entered into a partnership with Jenkins, and the two of them operated THRASHER'S during the summer of 1975. Subsequently, Brittingham and Jenkins had a falling out, and they terminated their partnership. At this point in time, it is apparent that Brittingham and Jenkins each believed that they owned THRASHER'S to the exclusion of the other. Accordingly, each of them began operating french fry enterprises like THRASHER'S.[4]
 
 
 6
 For his part, Jenkins continued to operate a french fry stand in Ocean City. In contrast, Brittingham began a french fry business in Salisbury, Maryland.[5] On December 5, 1975, Brittingham also filed an application for federal registration of the trademark THRASHER'S. A year later, on December 8, 1976, Jenkins' attorney wrote to Brittingham challenging his use of the THRASHER'S mark in his Salisbury business.[6] Upon advice of counsel, Brittingham did not respond to the letter, and Jenkins took no further action to protect his purported trademark. On December 28, 1976, the United States Patent and Trademark Office approved Brittingham's application for registration of the THRASHER'S mark. On August 31, 1978, Brittingham's lawyer wrote to Jenkins warning him that his use of the THRASHER'S mark in his Ocean City business constituted an infringement of Brittingham's federally registered trademark. The correspondence included Brittingham's registration number. Jenkins did not respond to this letter, and Brittingham declined to pursue the matter at that time.
 
 
 7
 In July of 1980, Brittingham began operating a THRASHER'S in Baltimore's Harborplace.[7] On July 18, Brittingham's lawyer wrote to Jenkins threatening immediate legal action against him if he continued to infringe upon the THRASHER'S trademark. The letter contained a copy of Brittingham's federal registration certificate. Jenkins's attorney replied on August 7, 1980, denying any trademark infringement, asserting that Jenkins was the common law owner of the THRASHER'S mark, and threatening Brittingham with legal action. As before, however, neither party sought to enforce their professed trademark rights against the other. In 1981, Brittingham attempted to open a THRASHER'S in the Georgetown neighborhood of Washington, D.C. This store never opened.
 
 
 8
 On September 24, 1982, Brittingham filed an affidavit with the Patent and Trademark Office attesting to five years of continuous and unchallenged use of the THRASHER'S service mark, thereby seeking incontestable status under the Lanham Act. A few days later, on September 28, 1982, Brittingham also registered the THRASHER'S mark under Maryland law. Approximately one month later, on November 2, 1982, Brittingham brought this infringement action against Jenkins in the United States District Court for the District of Maryland. A bench trial was conducted on September 19-20, 1983, and judgment was entered in favor of Jenkins on both the original complaint and the counterclaim.[8] The district court awarded Jenkins $794,134.89 in damages,[9] $228,714.18 in prejudgment interest, and $203,068.23 in attorneys' fees. Brittingham now appeals that decision, claiming that: (1) he did not obtain his trademark registrations fraudulently; (2) he did not infringe on Jenkins' common law trademark because of non-overlapping uses of the mark; (3) Jenkins' claim for damages and interest are barred by laches; (4) he did not violate section 43(a) of the Lanham Act which prohibits false designations of origins; (5) Jenkins is not entitled to attorneys' fees; and (6) he should not be held personally liable for damages.
 
 II.
 
 9
 Under the Lanham Act, the owner of a common law service mark used in commerce may apply to register the mark with the United States Patent and Trademark Office. 15 U.S.C. Sec. 1051(a). As this court noted in Georator Corp. v. United States, federal registration confers a number of benefits upon the owner of a mark not available at common law:
 
 
 10
 (1) constructive notice of the registrant's claim of ownership of the trademark; (2) prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and of his exclusive right to use the mark in commerce as specified in the certificate; (3) the possibility that, after five years, registration will become incontestible and constitute conclusive evidence of the registrant's right to use the mark; (4) the right to request customs officials to bar the importation of goods bearing infringing trademarks; (5) the right to institute trademark actions in federal courts without regard to diversity of citizenship or the amount in controversy; and (6) treble damage actions against infringing trademarks and other remedies.
 
 
 11
 485 F.2d 283, 285 (4th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974). The most significant of these advantages are proof of ownership and incontestability.
 
 
 12
 First, a certificate of registration of a mark serves as prima facie evidence that the registrant owns the registered mark, has properly registered it under the Lanham Act, and is entitled to its exclusive use in commerce. 15 U.S.C. Sec. 1057(b). Thus, registration creates a presumption of the registrant's ownership of the mark, subject to any applicable legal or equitable defenses or defects. 15 U.S.C. Sec. 1115(a). This attribute of registration represents a change from the common law where the putative owner bears the burden of establishing ownership of the disputed mark in any trademark infringement action.
 
 
 13
 Second, a registrant's right to use a mark may become incontestable after five years of continuous and unchallenged use, if such use has been averred to in an affidavit filed with the Patent and Trademark Office within one year after the five-year period. 15 U.S.C. Sec. 1065. Once a registered mark becomes incontestable, registration serves as conclusive evidence that the registrant owns the mark, has properly registered the mark under the Lanham Act, and has the exclusive right to use the mark in commerce. 15 U.S.C. Sec. 1115(b).
 
 
 14
 However, there are eight statutory defenses against an otherwise incontestable registration: (1) the mark was obtained fraudulently; (2) the mark was abandoned; (3) the mark was used with the permission of the registrant or his privy; (4) the alleged infringer used the mark in his own business because it was the name of that individual or his privy; (5) the alleged infringer adopted the mark prior to its registration, and has used it continuously without knowledge of the registrant's prior use and registration; (6) the alleged infringer used the mark pursuant to a prior, non-abandoned registration; (7) the mark violates the antitrust laws; and (8) equitable principles mandate that the mark's registration be canceled.[10] 15 U.S.C. Sec. 1115(b). Moreover, an incontestable registration is subject to cancellation if the trademark becomes a common descriptive term or a generic name for an item. 15 U.S.C. Secs. 1064(3) & 1065(4).
 
 
 15
 In his counterclaim, Jenkins asserted the first of these defenses, alleging that Brittingham had deceived the Patent and Trademark Office with regard to who owned the common law rights to the THRASHER'S mark. In short, Jenkins claimed that the Patent and Trademark Office never would have granted Brittingham's registration but for the false and fraudulent statements of ownership which Brittingham willfully made in his application.
 
 
 16
 The district court expressly determined that there was no reasonable basis for Brittingham's representation that he owned the THRASHER'S mark, and that this misrepresentation was material to the Patent and Trademark Office's decision to grant his application for registration. As a consequence, the lower court concluded that Brittingham's federal trademark registration had been obtained in a fraudulent manner.
 
 
 17
 On appeal, Brittingham argues that the district court committed reversible error in applying an incorrect test for fraud. A number of courts have held that the procurement of a trademark registration through the use of false or misleading statements does not constitute fraud within the meaning of 15 U.S.C. Sec. 1115(b)(1) unless the statements were both material to the decision to grant the registration and made with a deliberate intent to defraud. See Orient Express Trading Co. v. Federated Dept. Stores, Inc., 842 F.2d 650, 653 (2d Cir.1988); Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 942 (10th Cir.1983); Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir.1982); King Automotive, Inc. v. Speedy Muffler King, Inc., 667 F.2d 1008, 1011 (C.C.P.A.1981); Wrist Rocket Mfg. Co. v. Saunders Archery Co., 516 F.2d 846, 852 (8th Cir.), cert. denied, 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975); Aveda Corp. v. Evita Marketing, Inc., 706 F.Supp. 1419, 1425 (D.Minn.1989); Gear, Inc. v. L.A. Gear California, Inc., 670 F.Supp. 508, 512-13 (S.D.N.Y.1987); Five Platters, Inc. v. Purdie, 419 F.Supp. 372, 384 (D.Md.1976). Moreover, the alleged fraud must be established by clear and convincing evidence. Orient Express, 842 F.2d at 653; Beer Nuts, 711 F.2d at 942; Money Store, 689 F.2d at 670. Brittingham contends that the lower court failed to find clear and convincing evidence of an intent to defraud.
 
 
 18
 After revisiting the statutory scheme of the Lanham Act, we believe that it is not necessary for this court to address the question of fraud in this case because Brittingham's registration never acquired incontestable status as provided under 15 U.S.C. Sec. 1065.[11] Under that section, a federally registered mark becomes incontestable only if the mark has been in continuous use for five consecutive years and several other requirements are satisfied.[12] In the present case, Brittingham did not use the THRASHER'S mark from 1978, when he closed his two Salisbury businesses, until 1980, when he opened his Baltimore store. At oral argument, Brittingham argued that there was no lapse in his use of the mark during this period because the mark was used in the name of a business which he helped to create, Thrasher's, Inc., because he had licensed the mark to the new corporation, because the corporation entered into a lease agreement with the owners of Baltimore's Harborplace, and because advertising and news features heralded the opening of the new THRASHER'S store in Baltimore. Brittingham insists that these actions constituted an uninterrupted use of the THRASHER'S mark. We disagree. First, there was still a gap in time between the closing of the Salisbury stores and the founding of Thrasher's, Inc. Second, and more importantly, the five-year continuous use provision of 15 U.S.C. Sec. 1065 applies solely to the use of a mark in connection with the sale of goods and services, and not in relation to other business activities. The Lanham Act explicitly states:
 
 
 19
 For purposes of this chapter, a mark shall be deemed to be in use in commerce--
 
 
 20
 (1) on goods when--
 
 
 21
 (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
 
 
 22
 (B) the goods are sold or transported in commerce....
 
 
 23
 15 U.S.C. Sec. 1127. Brittingham failed to satisfy the second part of this definition because, for a time, he did not sell any products bearing the THRASHER'S mark.
 
 
 24
 Thus, contrary to the claims made in his affidavit of use filed with the Patent and Trademark Office,[13] Brittingham did not use the THRASHER'S mark continuously in connection with the sale of goods for the required five-year period following registration. Consequently, incontestability never attached to Brittingham's trademark registration. The Lanham Act contains no exceptions to the five-year continuous use requirement for incontestability, and we have discovered none in the published cases.[14] Accordingly, Brittingham's registration entitles him only to a rebuttable presumption of ownership as afforded in 15 U.S.C. Secs. 1057(b) and 1115(a).
 
 
 25
 Any persons challenging a registration may assert all available legal or equitable defenses or defects, such as the lack of ownership by the registrant, which might have been advanced had the mark not been registered. See 15 U.S.C. Sec. 1115(a). Thus, if a registration has not become incontestable under the Lanham Act, an individual may dispute the registrant's ownership of the mark as a means of contesting the validity of the registration. Of course, the challenger bears the burden of refuting a registrant's presumption of ownership.
 
 
 26
 At trial, Jenkins introduced evidence showing that he had purchased the THRASHER'S mark from Mrs. Hastings in 1974. Based on this evidence of ownership, Jenkins argued that Brittingham was not entitled to use or register the mark. The district court agreed with Jenkins, and found that, notwithstanding Brittingham's presumption of ownership under the statute, Jenkins was the common law owner of the THRASHER'S mark and that Brittingham's registration should be voided for that reason. Because that factual determination is not clearly erroneous and therefore binding on this court, we conclude that Brittingham was not entitled to a certificate of registration for the contested mark under 15 U.S.C. Secs. 1051(a) and 1057(a), and that cancellation of the registration by the lower court was appropriate under 15 U.S.C. Sec. 1064(3). Accordingly, we affirm that part of the district court's decision invalidating Brittingham's trademark registrations.
 
 III.
 
 27
 Although the district court found that Mrs. Hastings had sold the common law rights to the THRASHER'S mark to Jenkins in 1974, Brittingham insists that he did not infringe upon Jenkins' trademark because their respective businesses were located in distinct, non-overlapping and non-competing territories. In other words, Brittingham contends that there was no infringement because Jenkins' business was conducted exclusively in Ocean City, while Brittingham's stores were restricted to Salisbury and Baltimore.
 
 
 28
 As a general rule, the use of an appropriated mark without the permission of its owner in a geographic territory or commercial market apart from that developed by the mark's owner constitutes an infringement if the unauthorized use is likely to result or has resulted in confusion, mistake or deception on the part of the consumer. See Spartan Food Systems, Inc. v. HFS Corp., 813 F.2d 1279, 1284 (4th Cir.1987). The plainest evidence of confusion in this case was the tendering of coupons which had been marketed by Brittingham in Baltimore for redemption by Jenkins in Ocean City.[15] The use of these coupons illustrates several points: (1) the two enterprises shared a customer base and a marketing region; (2) at least some of their shared patrons believed that the two businesses were one and the same; and (3) the marketing efforts of one had a real impact on the operations and sales of the other. All of these factors lend cogent support to Jenkins' claim of common law trademark infringement.
 
 
 29
 Furthermore, in M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 448 n. 24 (4th Cir.1986), this court noted, albeit in dicta, that "the courts almost unanimously presume a likelihood of confusion based upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress." Brittingham admitted as much during questioning at trial:
 
 
 30
 Q. THRASHER'S had been around in Ocean City for a number of years, had it not?
 
 
 31
 A. Yes it had.
 
 
 32
 Q. Was it your intention to try to utilize that name recognition and good will in the operation of your stores in Salisbury?
 
 
 33
 A. Well, yes, I would naturally, by using the name, utilize it.
 
 
 34
 See Joint Appendix at 141-42. This presumption of confusion was not rebutted at trial.
 
 
 35
 In sum, Brittingham's use of the THRASHER'S mark was an infringement of Jenkins' exclusive rights thereto. Consequently, we affirm the district court's determination that Brittingham had infringed upon Jenkins' common law mark, and sustain the issuance of the permanent injunction by the lower court against Brittingham. The question of damages, however, is a separate matter which is discussed below.
 
 IV.
 
 36
 In trademark cases, as in other disputes, unreasonable delay in bringing a suit is always a serious impediment to relief being granted. McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828 (1878). Thus, this court has recognized that laches may be invoked as a defense against claims for damages in trademark infringement actions. See Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209, 212 (4th Cir.), cert. denied, 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982). While the operation of laches depends upon the particular facts and circumstances of each case, the following factors ordinarily should be considered: (1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay. Tobacco Workers Int'l Union, Local 317 v. Lorillard Corp., 448 F.2d 949, 958 (4th Cir.1971). If these factors are satisfied, laches normally will bar a trademark owner's claim for damages against an infringer. Skippy v. CPC, 674 F.2d at 212.
 
 
 37
 In this case, Brittingham and Jenkins had a falling out primarily because of Brittingham's plans to open a THRASHER'S in Salisbury in 1975. Thus, constructive knowledge of Brittingham's infringement can be imputed to Jenkins as early as that year. In addition, Jenkins had actual knowledge of Brittingham's infringement as early as December 8, 1976, when his attorney, Paul C. Ewell, wrote to Brittingham on Jenkins' behalf to challenge Brittingham's use of the THRASHER'S mark in the Salisbury business. Jenkins also knew that Brittingham had registered the THRASHER'S mark by August 31, 1978, when Brittingham's lawyer, James S. Waldron, wrote to Jenkins and provided him with Brittingham's federal registration number. When Brittingham opened a THRASHER'S in Baltimore in the summer of 1980, moreover, there could be no doubt that Brittingham had infringed on Jenkins' common law mark. Yet, Jenkins did not legally contest Brittingham's use of the THRASHER'S mark until January 4, 1983, when he filed his counterclaim in this case.
 
 
 38
 The foregoing chronology convinces us that Jenkins' delay in asserting his common law rights to the THRASHER'S mark was both unreasonable and inexcusable. Jenkins knew of Brittingham's infringement since at least 1976 and possibly as early as 1975, and still took no legal action to protect his mark against unauthorized use until 1983. In addition, the prejudice to Brittingham, who is now liable for profits and interest accrued over fifteen years of long uncontested use of the mark, is quite manifest. Consequently, we believe that the district court should not have awarded all of Brittingham's disgorged profits as damages to Jenkins in light of Jenkins' failure to challenge Brittingham's infringement in a more timely and deliberate manner.[16]
 
 
 39
 In its opinion, the district court stated that "laches is not available to one who intended the unfair competition," and that prejudice does not "consist merely of expenditures in promoting the infringement." See Joint Appendix at 339. Based on the facts of this case, however, it is conceivable that Brittingham had a bona fide belief that he was the common law owner of the THRASHER'S mark. This belief could have been sustained in good faith until Mrs. Hastings had testified at trial, a point in time well after Brittingham initially applied for registration. Thus, there was some basis for Brittingham's belief that he owned the common law trademark at issue in this case. In addition, Jenkins' legal inaction probably contributed to that misunderstanding. In our view, therefore, there is scant evidence to suggest that Brittingham intended any unfair competition.
 
 
 40
 In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 419, 36 S.Ct. 357, 362, 60 L.Ed. 713 (1916), the Supreme Court stated: "As to laches and acquiescence it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiff's rights, that relief by injunction would be accorded although an accounting of profits should be denied." Thus, under Metcalf, even if Brittingham did intend the unfair competition as the trial court found, the award of damages in this case still could and should have been limited by the defense of laches.
 
 
 41
 Because laches is an equitable defense, and because Brittingham did infringe on Jenkins' common law mark, we hold that Jenkins is entitled only to those damages arising after the entry of the district court's original judgment on December 16, 1987. We therefore remand this case to the lower court for a recalculation of damages.
 
 
 42
 In light of his inexcusable and unreasonable delay, we also believe that Jenkins is not entitled to prejudgment interest. In General Motors Corp. v. Devex Corp., 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983), a patent infringement suit brought under 35 U.S.C. Sec. 284, the Court noted that "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." This observation is equally valid in the trademark context, and is directly applicable to this case. Therefore, we reverse the trial court's award of prejudgment interest.
 
 V.
 
 43
 The district court also found Brittingham in violation of section 43(a) of the Lanham Act. That provision states:
 
 
 44
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 
 
 45
 15 U.S.C. Sec. 1125(a).[17] The test for trademark infringement under this section is whether there is a confusing similarity between the conflicting marks. Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir.1987); M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 449 (4th Cir.1986). Moreover, a district court's finding of public confusion must be sustained on appeal absent clear error. Transportation, Inc. v. Mayflower Services, Inc., 769 F.2d 952, 954-55 (4th Cir.1985). This test is similar to the "likelihood of confusion" test for infringement of a common law mark. See Spartan Food Systems, Inc. v. HFS Corp., 813 F.2d 1279, 1284 (4th Cir.1987). Accordingly, we hold that the district court did not commit clear error in finding Brittingham in violation of 15 U.S.C. Sec. 1125(a) for the reasons set forth in Part III of this opinion discussing common law trademark infringement.VI.
 
 
 46
 Under the Lanham Act, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. Sec. 1117(a). Pursuant to section 1117(a), the district court awarded $203,068.23 in attorneys' fees to Jenkins. Because Brittingham's claim of error goes exclusively to the question of whether this is an "exceptional" case within the meaning of section 1117(a), the lower court's award of attorneys' fees is reviewed under an abuse of discretion standard. See United Food & Commercial Workers, Local 400 v. Marval Poultry Co., 876 F.2d 346, 351 (4th Cir.1989). At this time, we do not decide whether the district court abused its discretion in awarding attorneys' fees to Jenkins in this case. Instead, we order the district court to re-examine its award on remand in light of Jenkins' diminished success following this appeal.
 
 VII.
 
 47
 Finally, Brittingham contends that he should not be held individually liable for the damages imposed by the district court. He alludes to a "piercing of the corporate veil" defense, but fails to advance or discuss any authority in support of his position. We find no merit to this argument. As the principal architect of the underlying infringement, equity requires that Brittingham be held jointly and severally liable for the judgment in this case.
 
 VIII.
 
 48
 Based on the foregoing discussion, we conclude that the district court's cancellation of Brittingham's registrations and the entry of a permanent injunction against him was appropriate. However, we remand this case for a recalculation of damages, and a reassessment of the attorneys' fees awarded to Jenkins in light of the more limited success obtained in this litigation. We also reverse the decision of the court below with regard to the award of prejudgment interest. Finally, we hold that Brittingham may be held personally liable for the judgment to be entered by the court below.
 
 
 49
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 This action was also brought by corporate plaintiffs Thrasher's, Inc. and Thrasher's of Georgetown, Inc. Hereinafter, the plaintiffs will be referred to collectively as "Brittingham."
 
 
 [2]
 This action was also brought against corporate defendants Synepuxent Pier & Improvement Company, Inc., Time, Inc., Ocean Fries Corporation and Resort Leisure Industries, Inc. Hereinafter, the defendants will be referred to collectively as "Jenkins."
 
 
 [3]
 These business interests included stock in Synepuxent Pier & Improvement Company, Inc., Southern Development Company, Ocean City Amusement & Fishing Pier, Inc., and Pier Ballroom, Inc., and a fifty percent partnership interest in the Boardwalk Company. Mrs. Hastings inherited these interests from her deceased husband
 
 
 [4]
 At trial, the two parties disputed whether and during which periods each used the THRASHER'S mark in promoting their respective businesses. Because it is clear that Brittingham and Jenkins both claimed exclusive rights to the THRASHER'S mark, whether by statute or under common law, and were both cognizant of the other's use of the mark, this factual dispute is of little consequence
 
 
 [5]
 Brittingham opened his first Salisbury store in the summer of 1975, followed by a second store during the ensuing summer. He closed the two Salisbury operations some time in 1978
 
 
 [6]
 In the letter, Jenkins' attorney mistakenly referred to Ocean City Pier and Improvement Corporation rather than to Jenkins or any of the corporate defendants in this case as the owner of the mark. Despite this drafting error, the correspondence established Jenkins' knowledge of Brittingham's infringement, and notified Brittingham of a competing claim to the THRASHER'S mark
 
 
 [7]
 Brittingham and other investors formed Thrasher's, Inc. in January of 1979 for the purpose of establishing a THRASHER'S store in Baltimore. Brittingham licensed the THRASHER'S mark to the new corporation sometime after its formation
 
 
 [8]
 The district court's decision on the merits was entered on December 16, 1987, over four years after trial. Thereafter, the court referred this case to a federal magistrate, on September 8, 1988, for a determination of damages. The magistrate entered his report and recommendations on July 14, 1989. Subsequently, the district court adopted the magistrate's recommended disposition, by an order dated August 14, 1989. The court also issued several clarifying and amending orders dated October 14, 1988, August 17, 1989, September 19 and 27, 1989, and October 20, 1989
 
 
 [9]
 Of this amount, $794,110.89 was awarded as disgorged profits and $24 was awarded as actual damages trebled
 
 
 [10]
 This last exception was added by the Trademark Law Revision Act of 1988, Pub.L. 100-667, 102 Stat. 3938, and became effective on November 16, 1989. Although the 1988 law does not indicate whether this new exception is applicable to pending litigation, section 46(a) of the Act of July 5, 1946, 60 Stat. 427, provided that no trademark provision shall affect any suit, proceeding or appeal pending on the effective date of the provision except as specifically provided therein. See 15 U.S.C. Sec. 1051 (Historical Note). Accordingly, we conclude that the exception contained in section 1115(b)(8) does not apply to this controversy
 
 
 [11]
 In his reply brief and at oral argument, Brittingham claimed that Jenkins raised this issue for the first time on appeal. This is not correct. Jenkins first challenged the incontestable status of Brittingham's registered mark in his post-trial brief filed with the district court on June 27, 1984. See pages 48-55 of Document 48 in Volume 2 of the Record on Appeal. The district court did not address this contention in any of its orders in this case
 
 
 [12]
 The additional requirements are as follows: the mark is still being used in commerce, the registrant has filed an affidavit with the Patent and Trademark Office within one year after the end of the five-year period, the mark has not become a generic name, and there is no adverse decision or pending proceeding, either judicial or administrative, regarding the registrant's ownership claim
 
 
 [13]
 In relevant part, the affidavit stated: "I, David A. Brittingham, am the owner of Registration No. 1,055,305 as shown by records in the Patent and Trademark Office; that the Mark shown therein has been in continuous use in interstate commerce for five consecutive years from December 28, 1976 to the present...." See Joint Appendix at 1171
 
 
 [14]
 In contrast, excusable or justifiable non-continuous use, discontinued use, or temporary abandonment does not destroy per se a registrant's right to use a mark or claim ownership of the mark. See Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 632, 47 S.Ct. 481, 482, 71 L.Ed. 810 (1927); 15 U.S.C. Sec. 1058(a)
 
 
 [15]
 These pre-paid coupons entitled the bearer to an order of french fries
 
 
 [16]
 However, we see no reason to set aside that part of the damages award based on actual injuries arising from the tendering of the gift certificates
 
 
 [17]
 This provision was extensively altered by the Trademark Law Revision Act of 1988, Pub.L. 100-667, 102 Stat. 3938. However, as discussed in note 10 supra, this section, as modified, does not apply to the present case